1  Brian R. Strange, Esq. (State Bar #103252)
   brian@strangellp.com
2  John Ceglia, Esq. (State Bar #287147)
3  john@strangellp.com
   Brianna J. Strange, Esq. (State Bar #321882)
4  brianna@strangellp.com
5  **STRANGE LLP**
   12100 Wilshire Boulevard, Suite 420
6  Los Angeles, CA 90025
7  Telephone: (310) 207-5055

8  *Attorneys for Plaintiff*

9
                  UNITED STATES DISTRICT COURT
10                CENTRAL DISTRICT OF CALIFORNIA

11

12

13  RISA POTTERS, individually and on       **Case No.: 2:23-cv-10335**
    behalf of all others similarly situated,
14                                           **COMPLAINT FOR INJUNCTIVE**
15              Plaintiff,                   **RELIEF AND DAMAGES**

16         v.                                **DEMAND FOR JURY TRIAL**

17
    WALMART, INC.; BLOCK, INC.; and
18  DOES 1–10 inclusive,
19
                Defendants.
20

21

22

23

24

25

26

27

28

# CLASS ACTION COMPLAINT

Plaintiff Risa Potters ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendants Walmart, Inc. ("Walmart"), Block, Inc. ("Cash App"), and Does 1–10 (collectively "Defendants"), based upon personal knowledge with respect to herself, and on information and belief and the investigation of counsel as to all other matters.  In support thereof Plaintiff alleges as follows:

## I. INTRODUCTION

1.        Defendants Walmart and Cash App have known for years that their financial services are a top choice for scammers.  Even while subject to FTC orders and government investigations, Defendants continue to ignore the obvious holes in their inadequate and poorly enforced anti-fraud measures and readily facilitate fraudulent transfers that drain financial resources of the elderly and most vulnerable in our society.  Meanwhile, Defendants profit from these fraudulent transactions and offer no real mechanism for victims to be refunded.  Defendants operate in violation of various consumer protection laws and use their status as licensed Money Services Businesses ("MSBs") to the detriment of individuals like Plaintiff.

2.        Walmart advertises itself as a "one-stop shop for financial services," which has translated to a one-stop shop for scammers who know that Walmart does not have adequate protections to flag and prevent fraud.  Knowing this, scammers regularly direct victims specifically to Walmart to carry out scams familiar to Walmart.  Similarly, Cash App boasts the ease of creating Cash App accounts without meaningful identification ("ID"), and it does little to keep scammers off its platform; nor does Cash App require that Walmart or its other partner retail stores verify IDs against Cash App accounts before making cash deposits, thereby allowing victims to deposit cash into scammers' accounts with zero backstop.

3.        This is a class action on behalf of Plaintiff Risa Potters, and others similarly situated, against Walmart for its role in initiating and facilitating

unreimbursed fraudulent transfers to scammers, including through Cash App. Plaintiff also brings this action against Cash App for its role in facilitating fraudulent money transfers through its paper money deposits—a Cash App user should only be permitted to deposit paper money into *their own* Cash App account, and yet Cash App is set up to allow anyone with a Cash App account to screenshot a barcode and direct a non-Cash App user to make a deposit onto the account associated with that barcode. Cash App thereby facilitates transfers to scam accounts with inadequate fraud-prevention measures.[1]  Victims like Plaintiff, who are not technology savvy, are especially vulnerable to the lack of fraud protection at Walmart and on Cash App.

4.     Plaintiff Risa Potters is a 73-year-old single woman who lives alone in Agoura Hills, California.  Between March 31 and April 1, 2023, Plaintiff was victimized by a caller who identified himself as a police officer.  The caller directed Plaintiff to make a series of deposits into Cash App accounts using barcodes purportedly associated with a bond account belonging to a court.  Plaintiff did not know, and Walmart did not inform her, that these were Cash App barcodes.

5.     As described further below, the caller specifically directed Plaintiff to Walmart stores in Southern California, where Walmart readily facilitated the transfers without question.  Among other issues, Walmart did not raise any red flags when Plaintiff, who had never used Walmart's services, first attempted to deposit $10,000 onto a Cash App barcode.  Nor did Walmart notify her that a Cash App paper money deposit is not intended for money transfers.  Instead, Walmart allowed Plaintiff to transfer $4,000 in less than 24-hours.  Cash App's money deposit system allowed scammers to simply text screenshots of barcodes associated with various scam Cash App accounts and send them to Plaintiff.  Cash App has no protocol in

---

[1] The process described in this paragraph is referred to throughout this Complaint as "Cash App deposits" and the financial money transfer services offered by Walmart and Cash App, including Cash App deposits, are referred to herein as the "Services."

place for linking an ID to a Cash App account, allowing scammers to take full advantage of cash deposits onto Cash App barcodes.  In the end, Plaintiff was scammed out of thousands of dollars, which funds were transmitted via the Cash App system at Walmart's stores.  Plaintiff has never recovered her lost funds.

6.     Walmart is a multinational corporation that sells groceries and other consumer goods.  In recent years, Walmart has expanded its offerings to include financial services across its thousands of store locations, including store locations in California and within this District.  Among the financial services offered by Walmart are money transfers and cash deposits.  Although certain Walmart locations have dedicated Money Centers, it offers financial services both at store locations with Money Centers and at store locations with only Service Desks.  Walmart benefits from these financial transactions while failing to train its employees to properly handle financial services.

7.     Cash deposits and transfers are a common vehicle for fraud.  Walmart customers have reported tens of millions of dollars annually in fraud-induced transactions processed by Walmart employees.  Similarly, Cash App users and non-users have reported rampant fraud conducted on and through the Cash App platform, including through a proliferation of scam accounts.

8.     These practices have harmed numerous consumers, including elderly consumers like Plaintiff.  Walmart and Cash App know that telemarketing and other mass marketing frauds, such as "grandparent" scams and government agent impersonator scams, induce people to use Walmart's and/or Cash App's services to send money to domestic and international fraud rings.  Nevertheless, Walmart and Cash App have continued processing fraud-induced money transfers at Walmart stores and via Cash App's system without adopting adequate policies and practices to effectively detect and prevent these fraudulent transfers.  Both Defendants are conducting financial services operations in violation of state and federal consumer protection laws.

9. As a result of Walmart's and Cash App's failures to take appropriate steps to mitigate this well-known problem, consumers like Plaintiff have lost substantial sums to fraud effectuated at Walmart stores and through the Cash App service.

## II.  PARTIES, JURISDICTION, AND VENUE

10. Plaintiff Risa Potters is a natural person residing at all relevant times in Los Angeles County, California. Plaintiff was seventy-three years old at the time of the events described in this Complaint. Plaintiff was induced to make fraudulent payments, including Cash App deposits, at Walmart store locations in this District.

11. Defendant Walmart, Inc. is a Delaware corporation with its principal place of business at 702 S.W. 8th Street, Bentonville, Arkansas 72716. Walmart transacts and/or has transacted business in this District, as well as throughout the United States.

12. Defendant Block, Inc. is a Delaware corporation with its principal place of business at 1955 Broadway, Suite 600, Oakland, California 94612. Block, Inc. transacts and/or has transacted business in this District, as well as throughout the United States. Block, Inc., formerly known as Square, owns and operates the Cash App money transfer application. Block, Inc. is referred to as "Cash App" in this Complaint.

13. The true names and capacities, whether individual, corporate, associate, or otherwise of each of the Defendants designated herein as a DOE are unknown to Plaintiff at this time, who therefore sue said Defendants by fictitious names, and will seek leave of this Court for permission to amend this Complaint to show their true names and capacities when the same have been ascertained.

14. The Court may properly exercise jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which at least one member of the Classes is a citizen of a state different from the Defendants. The number of

1    members of the proposed Classes in aggregate exceeds 100.    This Court has

2    supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

3         15.     This Court may properly exercise jurisdiction over Walmart and Cash

4    App because both Defendants conduct substantial business within this District and

5    because a substantial part of the events giving rise to Plaintiff's claims occurred in

6    this District.

7         16.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391(b) in that a

8    substantial part of the events and omissions giving rise to the claims alleged herein

9    occurred in this District and because Defendants transact business and/or have

10   physical stores (Walmart) or agents within this District.

11   ### III.  FACTUAL ALLEGATIONS

12   **A.    Defendants Are Financial Institutions**

13        17.     Defendants Walmart and Cash App are licensed Money Services

14   Businesses ("MSBs").  MSBs are financial institutions.[2]  Cash App is also licensed

15   as a Money Transmitter by California's Department of Financial Protection and

16   Innovation.

17        18.     Cash App allows users to send, receive, and withdraw money, to deposit

18   paper money into Cash App accounts through participating retailers, and to transfer

19   money in a CashApp account to linked bank accounts and Cash App debit cards.  To

20   deposit paper money into a Cash App account, a consumer must visit a participating

21   retailer and show the retailer a barcode generated by their Cash App account.  The

22   retailer then accepts the paper money and electronically transfers funds to the

23   consumer's Cash App account affiliated with the barcode.  On information and belief,

24   Cash App utilizes a third-party, InComm Financial Service's VanillaDirect

---

25   [2] "Note: Each money services business (MSB) is a <u>financial institution</u>.  For the
26   regulatory definition of "financial institution," see 31 CFR 1010.100(t) (formerly
27   31 CFR 103.11(n))."  *Money Services Business Definition*, U.S. TREASURY FIN.
     CRIMES ENFORCEMENT NETWORK, https://www.fincen.gov/money-services-
28   business-definition (emphasis added).

("InComm" or "VanillaDirect") network, to allow retailers to digitally transfer money to a Cash App account after receiving paper money.

19.     Defendant Walmart operates department and grocery stores throughout the United States and abroad.  Walmart provides financial services including Walmart MoneyCards, check printing, check cashing, cash deposit and withdraw, and certain types of installment lending.  In 2014, Walmart launched Walmart2Walmart, a fee-based program allowing customers to transfer money between Walmart stores.  In 2019, Walmart expanded its money-transfer services, and customers can now, for a fee, transfer money at Walmart stores using MoneyGram, Ria, and Western Union.[3]  In 2021, Walmart announced a partnership with InComm to provide additional financial services, including cash-loading services.  Walmart advertises itself as "a one-stop shop for financial services,"[4] and it often relies on other companies' (hereinafter "providers") money transfer systems, including MoneyGram, Ria, Western Union, and InComm to provide its financial services.  Walmart acts as an agent of these and other providers and is also a licensed MSB.

20.     On information and belief, Walmart uses its own point-of-sale system to process money transfers, including Cash App deposits, sent from its store locations.  Walmart also uses this system to exchange information with its providers. Walmart designed and controls the system in which its employees record information about money transfers, including sender ID, and whether and how its point-of-sale system can be used to stop fraud-induced transfers.

---

[3] *Walmart Generates an Estimated $1 Billion in Total Savings for Consumers Through Branded Money Transfer Services*, WALMART (Nov. 4, 2019), https://corporate.walmart.com/news/2019/11/04/walmart-generates-an-estimated-1-billion-in-total-savings-for-consumers-through-branded-money-transfer-services.
[4] *See, e.g.*, WALMART, https://www.walmart.com/store/5338-san-diego-ca/money-services (last visited Nov. 15, 2023).

21.     Walmart allows for paper money cash deposits and transfers to be made both at its Money Centers and at its Service Desks.  By offering financial services both in dedicated Money Centers and at Service Desks, Walmart can provide financial services at every Walmart store location rather than only those with dedicated Money Centers.  In addition to profiting off the transactions, Walmart's financial services offerings also drive foot traffic to its store locations, increasing sales revenue.

22.     As registered MSBs, Walmart and Cash App must comply with both the general obligations that apply to all financial institutions and the specific obligations that apply to MSBs.  Accordingly, under the Bank Secrecy Act ("BSA"), Defendants are required to, at a minimum: report suspicious activity for transactions in excess of $2,000; establish a written Anti-Money Laundering ("AML") program; maintain records for transactions over $3,000, including verification and recording of the money-transmitter's identity; adhere to specific identification and reporting requirements for individuals who are not established customers; and maintain additional records for transactions relating to pre-paid access.

23.     MSBs should implement a risk-based approach to AML, which requires tailoring the AML program to the unique money laundering risks of that particular MSB.  Financial institutions should make a reasonable effort to determine the true identity of all customers requesting financial services and should be aware of any unusual transaction activity or activity that is disproportionate to the customer's known business.  As a licensed Money Transmitter in California, Cash App is subject to additional anti-fraud and reporting requirements.

24.     Walmart and Cash App reap financial benefits from acting as MSBs while failing to safeguard against extensive fraudulent use of their services to the detriment of victims like Plaintiff.

**B.    Defendants' Knowledge of Fraudulent Transfers**

**Walmart**

25.    Walmart has long been aware that its financial services are used to perpetrate money-transfer frauds and scams, particularly against elderly U.S. consumers.  These scams take a variety of forms, including government imposter scams, family-in need scams, and employment scams, and they are often committed by a scammer that emails or calls a potential victim and directs them to send money through Walmart in order to avoid some threatened catastrophic outcome.

26.    These scams share the same basic trait: scammers send victims specifically to Walmart store locations to make financial transactions.  Walmart is a brick-and-mortar financial institution with locations throughout the United States, and it does not have adequate employee training policies or anti-fraud measures in place to protect fraud victims, making it an ideal place for scammers to direct money transactions.  Walmart offers money transfer services to consumers at thousands of locations in the United States and Puerto Rico, as well as in many other countries around the world.

27.    Scammers regularly select Walmart store locations to facilitate their scams because, among other reasons, there are many convenient Walmart store locations from which victims can send the money and the money can be transferred to the recipient nearly instantaneously; the funds can thereafter be transferred to any other account or withdrawn as the recipient desires.  Upon information and belief, once a Cash App deposit is made at a Walmart store, there is no way for it to be clawed back or returned to the sender absent the recipient voluntarily returning the funds.

28.    In order to deposit or send a money transfer, consumers must pay a fee that varies depending on the platform (in person versus online), the destination, the amount, and the method of payment.  Walmart also offers flat-fee money transfer services for consumers through Walmart2Walmart and Walmart2World money

transfers, which Walmart touts as a lower-cost alternative.  Between its own transfer services and through the services of its providers, Walmart has earned millions of dollars in fees on fraudulent transfers.

29.     Consumers often are instructed by scammers over the telephone, through text message, by email, or over the Internet to send money transfers at Walmart store locations.  Walmart then facilitates the scams by failing to, among other things, ask for ID, flag suspicious transactions, or generally employ an effective employee training/AML program.  These scams operate deceptively in violation of Section 5 of the Federal Trade Commission Act and other federal and state laws, and many of the scams also involve fraudulent telemarketing in violation of the Telemarketing Sales Rule ("TSR").  The TSR prohibits all cash-to-cash money transfers in telemarketing transactions, including those induced by scams.

30.     Records from Walmart providers MoneyGram, Ria, and Western Union show that between January 1, 2013 and December 31, 2018, Walmart was responsible for processing at least $197,316,611 in fraudulent transfers that were the subject of complaints to the providers.  The actual number is likely much higher, particularly in light of Walmart's fraud reporting procedures, discussed further *infra*.  Over $1.3 billion in money transfers were related to complaints received and therefore may have been similarly fraud-induced.  The average individual consumer fraud loss reflected by those complaints was approximately $870.

31.     Between April 24, 2014 and December 31, 2018, Ria reported receiving at least 43,603 complaints reporting losses of $32,741,212 in fraudulent money-transfer scams involving Walmart.  While Walmart accounted for approximately 27% of Ria's total money transfers based on dollar amount during 2017, Walmart was responsible for sending or paying out approximately 89% of all complained-about fraud-induced money transfers worldwide through Ria during 2017.

32.     While Walmart accounted for approximately 24% of MoneyGram's total money transfers based on dollar amount between January 2013 and December

2018, Walmart was responsible for sending or paying out approximately 56% of all complained-about fraud-induced money transfers worldwide through MoneyGram. MoneyGram reported receiving at least 176,672 complaints reporting losses of $159,594,760 involving Walmart.

33. In May 2018, Walmart conducted an analysis of Walmart store locations in the United States that would be classified as an Elevated Fraud Risk Agent Location ("EFRAL") and determined that, from January 2017 through January 2018, there were 317 instances in which Walmart stores met the EFRAL criteria, including 12 Walmart stores that had 15 or more complaints in a two-month period. The remaining 305 Walmart stores had five or more complaints that amounted to 5% or more of money transfers received at those store locations. Those 317 separate instances involved 190 unique Walmart store locations because some of the stores had met the criteria more than once.

34. Walmart's lack of employees trained in financial services and fraud awareness materials has existed for years and has been reported to Walmart numerous times. In 2018 and 2019, Walmart provider MoneyGram found that hundreds of Walmart employees still lacked knowledge about basic and important procedures, such as ID acceptance requirements and how to address suspicious activity.

35. MoneyGram warned Walmart about concerns over untrained Walmart employees handling money transfer services as early as 2014. A 2014 audit conducted by MoneyGram found that numerous Walmart store locations had untrained or undertrained employees providing or supervising money transfer services at Walmart's Customer Service Desks and Money Centers. MoneyGram informed Walmart that an audit of 397 Walmart store locations disclosed that 1,863 "primary and secondary" Walmart employees responsible for processing money transfers had not had either initial or ongoing training, and 68% of them were secondary employees who had never taken the required training. Walmart's own internal 2014 audit revelated that 39% of Walmart store locations overall had

untrained primary employees and 60% had untrained secondary employees engaged in financial services.  Walmart continues to allow untrained employees to provide financial services, including Cash App deposits, at its store locations.

36.     In May 2016, Walmart became aware that five individuals had been arrested in connection with an Internal Revenue Service ("IRS") impersonation scam that bilked thousands of U.S. consumers out of millions of dollars through fraud-induced money transfers picked up at Walmart store locations.  The scammers called unsuspecting victims and used Walmart financial services to perpetuate the fraud.  Ultimately, at least fifteen individuals were indicted in connection with that scheme, most of whom have since pleaded guilty.[5]

37.     In 2017, Walmart became aware of arrests in at least two other IRS impersonation scams that involved Walmart stores.  In one of those scams, four individuals were charged in connection with a scheme that used fake IDs to pick up $666,537 in money transfers from 784 victims between January and August 2017, often at Walmart store locations, with another 6,530 transactions totaling $2,836,745 linked to the fake identities used by those "runners" (also known as "money mules").[6]  In the other scam, two individuals pleaded guilty in connection with an India-based telemarketing scam, including one who later admitted to using 134 different fraudulent IDs to pick up over $1 million in fraud proceeds between September 2016 and May 2017, often at Walmart store locations.[7]

38.     Criminal authorities across the United States have charged other individuals in connection with mass marketing and telemarketing schemes that

---

[5] *See United States v. Caballero*, No. 16-cr-0124 (E.D. Ark.); *United States v. Caballero*, No. 16-cr-0201 (D. Minn.); *United States v. Mirabal*, No. 16-cr-0269 (N.D. Tex.); *United States v. Pando*, No. 17-cr-0046 (N.D. Miss.); *United States v. Labra*, No. 17-cr-0314 (D. Md.).

[6] *United States v. Gohil*, No. 17-cr-0212 (E.D. Wis.) (three defendants later pleaded guilty).

[7] *United States v. Patel*, No. 17-cr-0094 (E.D. Wis.).

1 obtained millions of dollars in fraud-induced money transfers that were sent from or

2 received at Walmart store locations.[8]  These schemes often involved suspicious

3 money transfers for high-dollar amounts using fake IDs and/or money mules to pick

4 up the proceeds of telemarketing and other frauds at Walmart store locations.

5       39.      Despite its awareness of a substantial amount of fraud-induced money

6 transfers involving Walmart store locations, Walmart has continually failed to

7 effectively detect and prevent consumer fraud involving money transfers at its store

8 _____

9 [8] *See, e.g.*, *United States v. Marcks*, No. 19-cr-0315 (D. Nev.) (five individuals

10 charged in connection with India-based telemarketing and email marketing imposter scam targeting elderly consumers in the United States between June 2015

11 and April 2017, wherein scammers falsely claimed consumers had outstanding taxes, open collection accounts, or other liabilities that required immediate

12 payments to avoid adverse action; at least two defendants pleaded guilty; internal

13 documents show that Walmart later became aware that this scheme's runners picked up at least 874 fraud-induced transfers totaling over $545,000 at Walmart

14 store locations); *United States v. Parmar*, No. 19-cr-0160 (E.D. Va.) (six

15 individuals charged in connection with international telemarketing scam involving government imposter and loan scams, including two individuals who pleaded guilty

16 to working with others to pick up millions of dollars in fraud-induced money transfers from U.S. consumers, often at Walmart store locations, between at least

17 March 2017 and April 2019); *United States v. Hines*, No. 17-cr-1038 (N.D. Iowa)

18 (six individuals pleaded guilty to involvement in relative-in-need or "grandparent"

19 telemarketing scam that used money transfers to bilk elderly consumers in the United States between December 2015 and September 2016; Walmart documents

20 showed the scheme used Walmart store locations to pick up fraud-induced

21 transfers); *United States v. Smith*, No. 21-cr-0372 (M.D. Pa.) (two individuals charged in connection with an advance-fee sweepstakes scam conducted between

22 October 2016 and June 2018 in which Jamaica-based fraudsters contacted victims

23 by telephone or the Internet; defendants regularly received fraud-induced money transfers from multiple Walmart store locations, including from multiple Walmart

24 store locations on the same day); *United States v. Budhadev*, No. 20-cr-0252 (M.D.

25 Pa.) (individual charged in connection with various India-based mass marketing schemes, including an advance-fee government grant scam, in which fraudsters

26 contacted victims by phone or Internet; defendant was charged with picking up over

27 $500,000 in fraud-induced money transfers between October and December 2015, including over 300 money transfers totaling more than $407,000 from over 250

28 senders at seven Walmart store locations).

1   locations.  Although Walmart purports to have implemented more effective training

2   and AML practices in the last several years, its practices are inefficient, inconsistent,

3   and continue to encourage scammers to utilize Walmart store locations as a safe-

4   haven for fraud-induced financial transactions.

5       40.      The FTC also investigated certain money-transfer services offered at

6   Walmart store locations for facilitating a growing money-transfer fraud problem.  In

7   or around 2009, Walmart, as an agent for money-transfer service provider

8   MoneyGram, became subject to a Stipulated Order for Permanent Injunction and

9   Final Judgment in *FTC v. MoneyGram*, No. 09-cv-6576 (N.D. Ill. Oct. 19, 2009)

10  ("2009 Order").  Among other things, the 2009 Order enjoined violations of any

11  provision of the TSR by providing substantial assistance or support to any seller or

12  telemarketer.  The 2009 Order also enjoined provider-agents like Walmart from

13  failing to establish, implement, and maintain a comprehensive anti-fraud program

14  designed to protect consumers from fraud-induced money transfers worldwide.  The

15  2009 Order's requirements included, but were not limited to, providing warnings to

16  consumers, providing appropriate and adequate ongoing education and training on

17  consumer fraud at all store locations, taking reasonable steps to monitor and

18  investigate activity at store locations to detect and prevent fraud, taking reasonable

19  steps to identify store locations that are involved or complicit in frauds, and routinely

20  reviewing and analyzing data regarding money transfer activities that are unusual or

21  suspicious.  Walmart acknowledged receipt of the 2009 Order on February 1, 2010.

22      41.      In 2017, Walmart, as an agent for money-transfer service provider

23  Western Union, became subject to a Stipulated Order for Permanent Injunction and

24  Final Judgment in *FTC v. Western Union*, No. 17-cv-0110 (M.D. Pa. Jan. 19, 2017)

25  ("2017 Order").  The 2017 Order similarly required implementing and maintaining a

26  comprehensive anti-fraud program to protect consumers by detecting and preventing

27  fraud-induced money transfers.  The 2017 Order's requirements also included, but

28  were not limited to, providing warnings to consumers, implementing appropriate and

adequate education and training to frontline store employees, monitoring customer activity to prevent fraud-induced money transfers, investigation of and disciplinary action against agents, and implementation of adequate systematic controls to detect and prevent fraud-induced money transfers.  The 2017 Order addressed compliance with the TSR Amendment's prohibition of cash-to-cash money transfers and required Walmart, as an agent of its provider Western Union, to identify, prevent, and stop cash-to-cash money transfers initiated in the United States from being used as a form of payment in telemarketing transactions.  The requirements also required Walmart to ask consumers before transferring money whether the transfers are to pay for goods or services offered or sold through telemarketing and declining to process such money transfers.

42.     Walmart persisted in its practices even after it had received notice of its obligations under the FTC's orders, and despite its obligations with its providers and its awareness of 2009 and 2017 Orders that impacted it as an agent for money transfer providers.

43.     In 2017, Walmart received two Civil Investigative Demands from the FTC and became aware that it was the independent subject of an FTC investigation. Walmart purported to make significant changes to its problematic practices.  But problems with untrained (and/or insufficiently trained) Walmart staff, and an inability to recognize or record suspicious transactions, continues.

44.     In its 2022 10-K filing, Walmart acknowledged that its money transfer services were under investigation.  The 10-K filing states that Walmart "has received grand jury subpoenas issued by the United States Attorney's Office for the Middle District of Pennsylvania seeking documents regarding the Company's consumer fraud program and anti-money laundering compliance related to the Company's money transfer services," and it "has also responded to civil investigative demands from the United States Federal Trade Commission (the 'FTC') in connection with the FTC's investigation related to money transfers and the Company's anti-fraud

program in its capacity as an agent."[9]  Walmart was aware that in November 2021, the FTC Bureau of Consumer Protection forwarded a draft civil complaint to the FTC seeking authority to file a complaint against Walmart and seeking various forms of monetary and injunctive relief related to Walmart's money transfer practices.[10]

45.    In June 2022, the FTC sued Walmart for violations of the Federal Trade Commission Act and the TSR related to Walmart's money transfer practices, again putting Walmart on notice that its financial services were being widely used to facilitate fraud.  *See, e.g.*, *Fed. Trade Comm'n v. Walmart Inc.*, No. 1:22-cv-03372 (N.D. Ill.) (case by FTC currently pending) ("2022 FTC Complaint").  The 2022 FTC Complaint details Walmart's long history of allowing under- and un-trained employees to handle financial services.

46.    Walmart has knowingly provided an essential service to fraudulent telemarketers, sellers, and con artists by permitting them access to its providers' financial services—including Cash App deposits—at its store locations while failing to have its own comprehensive and effective anti-fraud program and/or failing to comply with its providers' anti-fraud policies and procedures.  Scammers exploit this access to its full potential and cash in on mass marketing and imposter scams—providing financial gain for all parties other than the unsuspecting consumer.

## **Cash App**

47.    Cash App is primarily a peer-to-peer money transfer application.  It also allows users to deposit paper money into their Cash App account—a user selects the in-app option "Deposit Paper Money/find a nearby retailer" and then "Show Barcode."  A barcode then appears within the Cash App application (the "App").  The App then directs the user to "Ask cashier to scan a barcode."  The barcode, an

---

[9] Walmart Inc., Annual Report (Form 10-K) (Mar. 18, 2022), at 31, https://www.sec.gov/Archives/edgar/data/104169/000010416922000012/wmt-20220131.htm.

[10] *Id.*

example of which is shown below, expires after approximately ten minutes and can be regenerated simply by clicking the "Show Barcode" button again.



48.      A user should only be allowed to make paper money Cash App deposits into their *own* Cash App account.  But Cash App has put no measures in place to avoid the obvious potential for abuse—scammers simply screenshot the barcode linked to their Cash App account and send that barcode to someone else, even someone without a Cash App account, and direct the recipient to have a cashier scan the screenshotted barcode and add cash to the scammer's Cash App account.  Cash App charges a $1 fee for every paper money Cash App deposit and benefits from these transactions regardless of whether they are fraudulent or not.

49.      Cash App's employees and management are aware of the rampant fraud being committed on the platform, including fraud-induced Cash App deposits and

inadvertent transfers.  The Consumer Financial Protection Bureau ("CFPB") has been investigating Cash App's fraud-prevention policies (or lack thereof) since at least August 2020.  Specifically, the CFPB is investigating whether Cash App "deprived consumers of access to their funds or failed to adequately address customer concerns regarding fraud" and whether Cash App "failed to follow the requirements applicable to resolving errors and liability of consumers for unauthorized transfers."[11]

50.     On June 15, 2023, the United States Senate Committee on Banking, Housing, and Urban Affairs (the "Committee") requested that Cash App provide information on Cash App's practices and policies to mitigate and prevent financial scams and to record the number and types of reported fraud-induced transactions. Specifically, the Committee "sought to understand how Cash App has allowed fraud and scams to proliferate on its platform."[12]

51.     The Committee's request highlights that:

> Cash App's consumer protection policies have not kept pace with the explosion in customer interest in the platform.  According to Cash App's annual report, more than 51 million active monthly users have funded their accounts with more than $200 billion.  Two out of three users transact every week.  And yet, the company has not taken sufficient steps to protect consumers from the harm that its services have enabled. The annual report notes that although Cash App's peer-to-peer payment services make customers targets for "illegal or improper uses, including scams and fraud directed at our customers," the company's risk management policies and procedures "may not be sufficient to . . . prevent or mitigate" the risks of scams and fraud.[13]

---

[11] Petition to Enforce Civil Investigative Demands at 1–2, *Consumer Fin. Prot. Bureau v. Block, Inc.*, No. 3:22-mc-80214 (N.D. Cal. Aug. 18, 2022), ECF No. 1.
[12] Letter from U.S. Senate Comm. on Banking, Hous. & Urban Affairs to Brian Grassadonia, CEO of Cash App (June 15, 2023), *available at* https://www.banking.senate.gov/imo/media/doc/cash_app_letter.pdf (footnote omitted).
[13] *Id.* at 1.

52.      In a research report prepared by Hindenburg Research,[14] former Cash App employees described how Cash App is a processor of choice for scammers.  For example, one former Cash App partnership employee stated that "[e]very criminal has a Square Cash App account."[15]   Another former Cash App employee stated, referring to Cash App: "It's wide open.  And if I was a criminal, I would have done it [opened a Cash App account]."[16]  There is even a criminal gang named after Cash App.[17]

53.      The Hindenburg Research report also detailed how the Cash App platform has been overrun with scam accounts and fake users, which allows crime and fraud-induced money transfer schemes to proliferate: "Based on more than a dozen interviews with former employees involved in Cash App, pressure from management has resulted in a pattern of disregard for Anti-Money Laundering (AML) and Know Your Customer (KYC) laws.  The result has been a proliferation of fake accounts that facilitated scams, resulting in [Cash App] benefiting from increased transaction-based revenue along with inflated user metrics."[18]   Former Cash App employees described how Cash App management knew of, and regularly ignored, scams being transacted over the Cash App platform.

54.      The scam accounts and fake users that are prevalent on the Cash App platform were easy to identify for the researchers that compiled the Hindenburg Research report.  For example, the researchers identified numerous Cash App accounts in the name of "Jack Dorsey" (the founder of Block), including some accounts in his name that appeared specifically aimed at scamming people.  The

---

[14] *Block: How Inflated User Metrics and "Frictionless" Fraud Facilitation Enabled Insiders to Cash Out Over $1 Billion*, HINDENBURG RESEARCH, https://hindenburgresearch.com/block/ (last visited Nov. 17, 2023) [hereinafter HINDENBURG RESEARCH].

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

researchers also identified "dozens" of accounts belonging to users who identified themselves as "Elon Musk" and "Donald Trump."

55.     Cash App employees also described how Cash App was aware that "Cash App's user data has been inflated by single individuals that have numerous associated [Cash App] accounts, sometimes numbering in the hundreds.  Often these [accounts] were associated with blacklisted accounts banned for fraud or other policy violations."[19]  A former Cash App employee explained that Cash App accounts are "usually" linked to numerous other Cash App accounts—an obvious indicator of fraud and/or criminal activity—and, in fact, this occurred in about 60–70% of Cash App's user accounts by the former employee's estimation.[20]  Yet Cash App did nothing to stop the use of its platform by these easily identified fraudsters while it continued to expand its services.

56.     Cash App has user tracking software that allows it to track individual Cash App users that have "dozens or even hundreds of accounts" associated with that same user.[21]  For example, a former Cash App customer service representative provided the researchers with the screenshot below, which demonstrates the vast number of connections between supposedly distinct Cash App accounts.  Each gray triangle in the screenshot below supposedly represents a unique "Cash [App] Customer," but the connections in the screenshot show that Cash App's software believed the numerous accounts shown were all linked to the same person (circled in red):

---

[19] *Id.*
[20] *Id.*
[21] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12



(Screenshot of Cash App CRM chart showing example of user
accounts connected to blacklisted accounts. Source: Former Cash
App customer service rep)

57.     Cash App employees called multiple Cash App account connections,
like the example shown in the screenshot above, "the web of lies," and indicated that
such multiple account connections were common and seen as a red flag of possible
fraud.[22]  Three former Cash App customer service employees estimated that nearly
half of the accounts they reviewed during a typical shift would have more than a
dozen linked accounts.[23]  These numerous connections between Cash App accounts
were a red flag for fraud, with a former employee stating: "The people that you see
that just have like 10 or so other accounts tied to them, it's, you know, the assumption
is that they must be doing something, you know, risky."[24]

58.     A Cash App account can be active even though it has previously been
tied to Cash App accounts that were banned for fraudulent activities or otherwise
flagged as suspicious by Cash App's internal tracking tools.  Cash App's policies did
not ban users caught engaging in fraudulent activities based on Social Security

---

[22] *Id.*
[23] *Id.*
[24] *Id.*

numbers (if those were even provided to Cash App) and Cash App was aware that users could easily come up with new phone numbers or email addresses to get back onto the Cash App platform.  A former Cash App employee explained: "Cash App will not deny you based on your Social Security number.  So, they'll deny you on your e-mail or your phone number, but if you get a new phone number or a new email, you can come back through to get the [Cash App prepaid] card because you're not blocked by your Social Security number, so you can come right back in."[25]

59.     Cash App's lax or nonexistent fraud prevention policies, and Cash App's failure to adequately enforce what policies it did have, are well known to scammers and Cash App alike.  The ability for users blacklisted for fraud to easily get back on the Cash App platform is so widely known that it is referenced in popular rap songs.  For example, rapper Teejayx6 wrote a song entitled "CashApp," in which one lyric stated: "They banned my Cash App because I sent a thousand transactions. . . . I just bought another phone and made a [new] Cash App [account]."[26]

60.     Even when fraud is reported to Cash App, Cash App has been slow to take action to remediate the fraudulent activity, if any action was taken at all.  For example, in June 2022, a reverend in Mississippi discovered that he was not receiving money sent to him on Cash App by his parishioners.[27]  Instead, he learned that parishioners were mistakenly sending their money to scam Cash App accounts that were set up to impersonate the reverend.  The reverend contacted Cash App, which told him they would expedite an investigation, but nothing happened and the reverend contacted Cash App again and was told the same thing. Cash App only removed the

---

[25] *Id.*

[26] Teejayx6, *CashApp*, YOUTUBE (Oct. 9, 2020), https://youtu.be/vlQZHAJYGB8?t=59.

[27] Kate Bieri, *"It's Sad": Scammers Pose as Mid-South Pastor on Cash App*, FOX13 MEMPHIS NEWS (Aug. 29, 2022), https://www.fox13memphis.com/news/it-s-sad-scammers-pose-as-mid-south-pastor-on-cash-app/article_bb3cc6ce-f7da-53df-9890-7ce044c570c4.html.

scam accounts after the reverend contacted a congressman, as well as local news reporters, which ran a story on the scam. While Cash App eventually removed the individual scam accounts, neither the reverend nor his parishioners received a refund of any of the money sent to the scam accounts according to the report. The reverend stated: "They [Cash App] are saying that whenever someone sends money via Cash App, you know, if you sent it to the wrong person, you just sent it to the wrong person."[28]

## C.    Walmart Partners with Cash App

61.     As Walmart came under greater scrutiny for its role in facilitating fraudulent money transfers, it announced in 2021 that it would expand its financial offerings by partnering with InComm's VanillaDirect network, which, on information and belief, allows Walmart customers to deposit paper money directly into Cash App accounts.

62.     On or around October 26, 2021, after it had received grand jury subpoenas and evidence of hundreds of millions of dollars fraudulently transferred through its stores, Walmart publicly announced "a more convenient and efficient way for customers to pay their bills or fund prepaid accounts nationwide at more than 4,700 Walmart locations in the United States," an option that "add[ed] to the retailer's already extensive financial services."[29]  Walmart advertised its new partnership in a press release, stating that:

> The cash payment process is quick and convenient. Consumers can . . . fund a variety of account types at Walmart's customer service desk or Walmart Money Center by scanning a barcode tied to their account

---

[28] HINDENBURG RESEARCH, *supra* note 14.

[29] *Walmart Offers More Convenience to Millions of Customers Nationwide by Expanding In-Store Bill Payment and Cash Loading Services with InComm Payments*, WALMART (Oct. 26, 2021), https://corporate.walmart.com/news/2021/10/26/walmart-offers-more-convenience-to-millions-of-customers-nationwide-by-expanding-in-store-bill-payment-and-cash-loading-services-with-incomm-payments.

(either via a paper copy or digitally on their mobile device) and completing their payment with cash.   Funds are then transferred electronically through a single consolidated settlement.[30]

63.     VanillaDirect allows Cash App users to make paper money deposits into Cash App accounts.   Cash App users should only be permitted to deposit paper money into *their own* Cash App account.   Cash App's online instructions for how to make a "Paper Money Deposit" read: "You can deposit paper money into *your Cash App* balance at participating retailers."[31]   In order to make a paper money deposit into a Cash App account, Cash App customers are instructed: "After you've arrived at the store, tell the cashier you want to load funds to your Cash App using your barcode. If they're not sure how to help, you can show them the instructions by tapping the ? on your map.   Once the cashier scans the barcode within your Cash App, hand them the money you'd like to deposit.   The funds will automatically be added to your Cash App balance.   We recommend keeping a copy of your receipt from the cashier."[32]

64.     Cash App policy allows a customer to make Cash App deposits of up $500 per deposit, up to $1,000 in any rolling 7-day period, and up to $4,000 per any rolling 30-day period.[33]

65.     Users should not be permitted to deposit money into someone else's Cash App account, however, without adherence to the MSB requirements, like matching a depositor's ID to the Cash App account, both Walmart and Cash App allow scam victims to deposit money into scam accounts.

66.     As described further below, Plaintiff sought to transfer money through Walmart store locations, following the scammer's advice to show the Walmart employee a barcode the scammer had texted her.   Plaintiff did not have a Cash App

---

[30] *Id.*

[31] *Paper Money Deposit*, CASH APP SUPPORT, https://cash.app/help/us/en-us/6488-paper-money-deposits (emphasis added) (last visited Nov. 15, 2023).

[32] *Id.*

[33] *Id.*

or know what Cash App is—but there was, as known to Cash App—zero measures for preventing someone like Plaintiff from depositing cash onto barcodes associated with someone else's Cash App account.  Plaintiff simply showed the Walmart employee a screenshot of a barcode that had been texted to her.  Not once at the three Walmart store locations that Plaintiff visited did any Walmart employee correct or attempt to stop Plaintiff from her request to deposit funds into another person's Cash App account through a barcode screenshot, nor did Defendants flag the transaction when Plaintiff first requested to deposit $10,000 onto a single barcode, nor did they flag when Plaintiff deposited over $4,000 within 48 hours at Walmart stores, including back-to-back $500 transactions within minutes of each other.  Instead, Walmart and Cash App treated Plaintiff the same way they treated other victims, including elderly victims, of money-transfer fraud: they processed the fraudulent transfers without question.

## D.    Walmart and Cash App Fail to Prevent Fraud

67.    Walmart and Cash App, as MSBs and agents of MSBs, are well-positioned to detect and prevent fraud-induced transfers.

68.    Walmart and Cash App fail to take basic and important steps to address consumer fraud, including by failing to implement and maintain effective policies and procedures to detect and prevent fraud, provide education and training that included clear directions to their employees about detecting and preventing consumer fraud, supervise and oversee their employees to ensure that they are complying with anti-fraud and AML policies and procedures, routinely provide fraud warnings to consumers, adequately monitor and investigate money transfer activity to determine if there is any unusual or suspicious activity, and take effective actions to prevent consumers from sending or receiving fraud-induced money transfers, including Cash App deposits, related to telemarketing, imposter, and other scams.

69.    Walmart's role as a large agent offering multiple money transfer services makes it integral to that effort because Walmart controls whether to:

implement and maintain policies and procedures concerning fraud-induced transfers, educate and train its employees on consumer fraud, supervise its employees to ensure they are complying with anti-fraud policies and procedures, provide fraud warnings to consumers, monitor and investigate money transfer activity to identify unusual or suspicious activity, and take actions to prevent consumers from sending or receiving fraud-induced money transfers, including those related to telemarketing, imposter, and other scams. Indeed, Walmart is obligated to do many of these things by contract or court order with respect to a number of the money transfer services it offers, including MoneyGram, Ria, and Western Union. Walmart's agreements with its providers require it to comply with any orders, judgments, or decrees that apply to its providers, as well as any applicable laws.

70. As MSBs and agents of MSBs, Walmart and Cash App are required by the BSA to have effective AML programs to guard against money laundering, including, but not limited to, guarding against the flow of illicit funds, such as funds derived from fraud.

71. For many years, anyone seeking to send money to an account through a Walmart store location was typically required to complete a "send form," which contained certain consumer fraud warnings. The send form required the sender to provide his or her name, physical address and telephone number, the name of the recipient, and the state/province and country to which the money transfer was being sent. In or around late 2019, Walmart stopped requiring senders to complete send forms, but before completing their transactions, Walmart began providing senders with a printout containing consumer fraud warnings in small print. For years, Walmart did not ask senders of money to present identification unless the customer's transfers exceeded a certain dollar threshold set by Walmart's providers.

72.     Walmart's policies state that a "government issued photo ID is required for some transactions," but it does not specify which ones.[34]  On information and belief, Walmart uses its own point-of-sale systems, at least in part, to process money transfers, including via Cash App deposits, and determines whether to ask for an ID unless that policy is specifically set by the provider.  On information and belief, Walmart designed and controls both the system in which its employees record information about money transfers and deposits, and whether and how its point-of-sale systems can be used to stop fraud-induced transfers.

73.     Regarding its ID policy, Cash App's website simply states: "Certain merchants and retailers may ask for your ID as an additional verification step when you deposit cash.  Since your Paper Cash deposit is being made at a store, you'll need to follow any policies that location has in place."[35]  Walmart's website states only that: "A government issued photo ID is required for some transactions."[36]

74.     Once the cash funds have been deposited into the Cash App account associated with the scanned barcode, fraud victims usually cannot receive their money back unless the sender voluntarily returns it.  Similarly, for many years at Walmart store locations, senders of funds typically could not get their money back unless they asked for a refund before the money transfer had been picked up by the recipient.  Today, funds are electronically sent nearly instantly.

75.     Even in the face of independent obligations to detect and prevent consumer fraud and money laundering, for many years, Walmart has failed to: (a) establish, implement, and maintain a comprehensive and effective anti-fraud program designed to detect and prevent consumer fraud; (b) properly train and ensure that its

---

[34] *Deposits & Withdrawals at Everyday Low Prices*, WALMART, https://www.walmart.com/cp/deposit-and-withdraw/8401365?povid=MNY_ FinancialServices_5433_MoneyServices_Deposit&Withdraw_LearnMore_TileCar d (last visited Nov. 15, 2023) [hereinafter *Deposits & Withdrawals*].
[35] *Paper Money Deposit*, *supra* note 31.
[36] *Deposits & Withdrawals*, *supra* note 34.

employees are knowledgeable about anti-fraud and AML policies and procedures designed to prevent consumer fraud; (c) adequately oversee and supervise employees responsible for providing money transfer services at its store locations; (d) adequately monitor and investigate unusual or suspicious activity at its store locations to prevent fraud-induced money transfers; (e) stop Cash App deposits that Walmart and/or its employees should know or suspect are fraud-induced; (f) adequately collect, record, and report consumer fraud involving money transfers, including Cash App deposits, at its store locations; and (g) take other reasonable steps to prevent fraudulent telemarketers, sellers, and con artists from using money transfer services, including Cash App deposits, offered by Walmart to perpetrate their frauds.  In some cases, Walmart has failed to adopt effective policies concerning these practices, while in others, Walmart has failed to adhere to, or has violated, its providers' policies and procedures or its own anti-fraud and AML programs, policies, and procedures.

76.     Cash App similarly controls whether to: (a) establish, implement, and maintain policies and procedures concerning fraud-induced money transfers; (b) monitor and eradicate scammers from its platform; (c) educate and train its employees on consumer fraud; (d) supervise its employees to ensure they are complying with anti-fraud policies and procedures; (e) prevent individuals without Cash App accounts from depositing cash into scam accounts for goods and services; (f) provide fraud warnings to consumers; (g) monitor and investigate money transfer activity to identify unusual or suspicious activity; and (h) take actions to prevent consumers from sending or receiving fraud-induced money transfers, including those related to telemarketing and imposter scams.

77.     However, even in the face of these independent obligations to detect and prevent consumer fraud and money laundering, Cash App has failed to: (a) establish, implement, and maintain a comprehensive and effective anti-fraud program designed to detect and prevent consumer fraud; (b) properly train and ensure that its employees are knowledgeable about anti-fraud and AML policies and procedures designed to

prevent consumer fraud; (c) adequately monitor and investigate unusual or suspicious activity on its platform to prevent fraud-induced money transfers; (d) stop Cash App deposits that Cash App and/or its employees should know or suspect are fraud-induced; (e) adequately collect, record, and report consumer fraud involving money transfers, including Cash App deposits, made utilizing its platform; and (f) take other reasonable steps to prevent fraudulent telemarketers, sellers, and con artists from using money transfer services, including Cash App deposits, to perpetrate their frauds.  Cash App has failed to adopt effective policies concerning these practices and/or failed to adhere to, or has violated, its own anti-fraud and AML programs, policies, and procedures.

78.    For many years, perpetrators of frauds, including fraudulent telemarketers, sellers, and con artists, have accessed and exploited Walmart's money transfer services (including through fraudulent Cash App deposits to others' accounts), and Walmart's store locations have played a critical role in the scams.  Walmart's store locations have been more susceptible to fraud-induced money transfers in part due to the thousands of Walmart store employees authorized to provide money transfer services at its store locations, the high turnover rate of Walmart employees, heavy customer traffic in its stores, and/or various shifts of employees working at a single Walmart store location.  Walmart and Cash App have been, or should have been, aware of these facts.  Both Defendants were subject to investigations and/or orders for lax practices that allowed fraud to thrive, but instead of addressing these concerns, they expanded their services to more customers.

79.    Walmart also has not taken adequate and timely steps to address the deficiencies and inconsistencies in its own anti-fraud program, policies, and procedures to address consumer fraud at its store locations.  In addition, in some cases, Walmart has had corrupt or complicit employees at its store locations that have facilitated the payment of fraud-induced money transfers.  As a result of Walmart's failure to implement and maintain a comprehensive anti-fraud program to detect and

prevent consumer fraud, it has played a significant role in sending and receiving fraud-induced money transfers through its providers' money transfer systems, including through Cash App deposits. These failures have caused millions of dollars in consumer losses.

80.     One of the ways in which Walmart's anti-fraud practices have been deficient is in the training of its frontline employees, as well as its supervisors and managers, referred to internally as associates (collectively "employees"). In many cases, Walmart has failed to properly train and oversee employees responsible for detecting and preventing consumer fraud involving money transfers at its store locations. These deficiencies have included Walmart's failure to provide employees with adequate initial and ongoing training on detecting and preventing consumer fraud, including training about questioning and warning consumers, and rejecting and stopping suspected fraud-induced money transfers. Walmart also failed to ensure that its employees providing financial services, including Cash App deposits, are knowledgeable about the policies and procedures necessary for detecting and preventing consumer fraud and failed to follow the law in doing so.

81.     For example, on December 14, 2015, the FTC published a notice that it had adopted amendments to its Trade Regulation Rule entitled "Telemarketing Sales Rule" ("TSR"), including a prohibition against using "cash-to-cash" money transfers for outbound and inbound telemarketing transactions.[37] The TSR Amendment became effective on June 13, 2016, and it prohibits the use of money transfers for goods or services offered or sold through telemarketing or charitable contributions solicited or sought through telemarketing. But until recently, Walmart failed to provide any instructions to its employees or warnings to consumers that specifically addressed the TSR Amendment.

---

[37] 80 Fed. Reg. 77520 (Dec. 14, 2015) ("TSR Amendment").

82.      Walmart has also failed to adequately monitor money transfer activity and address suspicious money transfer activities at its store locations, including by Walmart employees who have been complacent in detecting and preventing consumer frauds or, in some cases, were engaged in suspicious activities or even complicit in frauds.  In many cases, Walmart has facilitated scams by paying out fraud-induced money transfers in violation of its providers' anti-fraud policies and procedures, or by failing to implement and maintain its own anti-fraud program designed to detect and prevent consumer fraud at its store locations.  Walmart has failed to properly train and ensure that its employees are knowledgeable about other basic and important procedures, such as verifying and accurately recording identification and other customer information and addressing suspicious activity.  Nor has Walmart adequately educated its employees on the financial services it provides, allowing unsuspecting fraud victims to "transfer" money through Cash App deposits.

83.      For many years, Walmart has failed to establish, implement, and maintain its own comprehensive anti-fraud program, policies, procedures, and controls designed to detect and prevent consumer fraud even though Walmart has been aware that there was a substantial amount of fraud-induced money transfers moving through the money transfer systems at Walmart's store locations.   On information and belief, until in or around November 2014, Walmart did not even have a written anti-fraud and consumer protection program documenting its policies and procedures for detecting and preventing consumer fraud at its store locations.

84.      Even after establishing a written anti-fraud program, in some cases Walmart violated its own program requirements.  For example, although Walmart's anti-fraud program required stores that had been identified by its providers as having higher incidents of fraud received at their locations to complete "Receive Fraud Training" within seven days of when the training was assigned, in many cases, those locations did not comply with that requirement.  In some cases, the training required

by MoneyGram at particular Walmart store locations was not completed for months after Walmart's policies required it.  In addition, even though Walmart's anti-fraud program required Walmart stores to have certain consumer education and awareness materials, including consumer fraud warnings and pamphlets, in many cases, Walmart store locations have not complied with those requirements.

85.     On April 19, 2017, MoneyGram conducted a Home Office Review of Walmart's anti-fraud program and found that: (1) Walmart had not effectively prevented fraudulent transactions; (2) Walmart had not properly completed required information on transaction records; and (3) Walmart had not reported, filed, or referred all Suspicious Activity Reports as required.

86.     Similarly, Cash App has failed to establish, implement, and maintain an adequate and comprehensive anti-fraud program, policies, procedures, and controls designed to detect and prevent consumer fraud even though Cash App has been aware that there was a substantial amount of fraud-induced money transfers moving through its platform.

87.     As an initial matter, Cash App allows users to join its platform with just a name, ZIP code, and an email address or phone number.  By requiring its users to provide such little information in order to join the Cash App platform, Cash App cannot effectively address fraudulent transactions while financially benefitting from them (both in growing its user base and in charging for Cash App deposits and withdraws).  Cash App allows virtually anyone to join the platform, even if they have already been suspended for fraud, and to receive funds through the platform.  It is widely known that both an email address and a phone number can be quickly and easily created online, at no cost, and without providing accurate or verifiable identification information.  Despite this fact, according to a former Cash App compliance employee, Cash App's management appeared to "insist[] that phone numbers were the modern-day equivalent of Social Security numbers," despite the obvious difference that Social Security numbers are issued by the government and

require identity documentation to obtain.[38]  One former Cash App employee told Hindenburg Research: "Banking isn't all that different than it was 100 years ago," which is why reasonable compliance requires collecting more information than a phone number or email, because "I need to find you if you ripped me off."[39]

88.    Cash App's website[40] stresses that a bank account is not required to join the Cash App platform:

**Cash App**                                                    Log in

# Common Questions

Do I need a bank account to use Cash App?                          −

No, you don't need a bank account to create a Cash App account or add money to your Cash App balance.

There are a number of ways to send and receive money through Cash App if you don't have or want to link your bank account. You can deposit paychecks, tax returns, and more to your Cash App balance using your Cash App account and routing numbers. And you can even deposit paper money into your Cash App balance at participating retailers.

**(Source: Cash App FAQ (https://cash.app/bank))**

89.    And while Cash App theoretically had a policy of disallowing fraudulent transactions on its platform, Cash App's implementation of that policy was lax and nonsensical, making it easy for scammers to continue to use the Cash App platform even after Cash App kicked them off for violating its policies.  By allowing anybody with a phone number or email address to join the Cash App platform, Cash App created a system in which users could join the Cash App platform multiple times under multiple names.  A former Cash App employee stated that getting kicked off of the Cash App platform was just a temporary problem for scammers: "It wasn't like, TSA's No-Fly list.  You know it was kind of like the [Cash App] account will

---

[38] HINDENBURG RESEARCH, *supra* note 14.
[39] *Id.*
[40] *Common Questions*, CASH APP, https://cash.app/bank (last visited Nov. 17, 2023).

get closed and then they'll try it again and maybe get to use it for a little while longer, until, you know, maybe the next account gets closed."[41]

90.     In addition, when a Cash App user creates an account on the platform and provides a name, the Cash App platform allows users to later change their names. This policy allows Cash App users to easily impersonate others, including government officials, like IRS agents or court bailiffs, in order to more easily engage in the solicitation of fraudulent transfers.

91.     Cash App's former employees summarized Cash App's approach to fraud prevention on its platform: "I felt that we were like super lenient with like, the requirements to join the [Cash App] platform, and then it was just like, 'Oh, we wonder why we're seeing fraud happening.' . . . that's because it's super easy to defraud this company and to join the [Cash App] platform."[42]

92.     Cash App operates the third most utilized cash transfer application in the United States and claims to have developed a "frictionless" and "magical" financial technology platform.[43]  However, in truth, Cash App has become the cash transfer application of choice for criminals and fraudsters, owing in large part to its lack of fraud-prevention policies and its ease of use for fraudulent transactions.

93.     And by allowing anybody, even those without a Cash App account (like Plaintiff) to make a deposit into any Cash App account at any Walmart store location and transfer money without any backstop, Cash App and Walmart have effectively removed all barriers to fraudulent activity, making fraud-induced cash transfers as easy as ever.

94.     When a consumer is the victim of fraud at Walmart, Walmart drives consumers into an unhelpful maze and passes the buck.   Walmart's "Fraud

---

[41] HINDENBURG RESEARCH, *supra* note 14.
[42] *Id.*
[43] *Id.*

Prevention" page[44] details money-transfer and cash deposit scams Walmart is familiar with that involve money deposits or transfers.  Walmart then provides phone numbers for providers like MoneyGram, GreenDot, and InComm.  It also links to websites for the Internet Fraud Complaint Center, the Better Business Bureau, the FTC, and the Consumer Financial Protection Bureau.  Notably, Walmart does not mention Cash App anywhere on this website, requiring consumers to determine the relationship between InComm and Cash App.

95.     On its "Fraud Alerts" page,[45] Walmart states that the scams it describes "are not from Walmart," and that the information is provided only "in an effort to educate you [the consumer] about these activities."  Someone who suspects they are a victim of fraud "may want to contact the Federal Trade Commission or the Consumer Fraud Division of your state's Attorney General's office."  The scams Walmart goes on to describe are exactly the scams that move millions of dollars in fraudulently transferred money through Walmart store locations every year.

96.     Rather than accept customer complaints itself, Walmart's website directs consumers to file a complaint with the FTC.  Of course, as Walmart likely knows, the FTC clarifies that it "can't resolve your individual report."[46]  Defrauded consumers are left with no recourse through Walmart.

97.     Cash App has similarly created an indecipherable maze that the average consumer, particularly elderly consumers, would be hard-pressed navigate.  First, transaction receipts provided by Walmart for Cash App deposits made at Walmart store locations using Cash App barcodes do not mention Cash App or Block.  The receipts Plaintiff received mention only VanillaDirect and point consumers to the

---

[44] *Fraud Prevention*, WALMART, https://corporate.walmart.com/about/samsclub/fraud-prevention (last visited Dec. 6, 2023).
[45] *Fraud Alerts*, WALMART, https://corporate.walmart.com/privacy-security/fraud-alerts (last visited Dec. 6, 2023).
[46] *ReportFraud.ftc.gov*, FED. TRADE COMM'N, https://reportfraud.ftc.gov/#/?orgcode=WMT (last visited Dec. 6, 2023).

VanillaDirect website, wherein consumers can input the barcode number from the *Cash App barcode* that they used at Walmart to generate an "e-receipt" for their transaction:



Screenshot from VanillaDirect website.[47]

98.     The logo on the VanillaDirect website, located next to the barcode image, is not the same as the logo on the Cash App-generated barcode, which is a bright green dollar sign.  A consumer would need to assume that the VanillaDirect and Cash App barcodes are essentially the same.  Then, the consumer would need to find the Cash App barcode generated for a particular transaction and enter that 30-digit barcode number into the VanillaDirect website in order to generate an e-receipt or to locate the transaction.

---

[47] *VanillaDirect Pay*, VANILLADIRECT, https://pay.vanilladirect.com/ereceipt (last visited Dec. 4, 2023).

99.     The VanillaDirect website provides an e-receipt for the Cash App deposit transaction, which includes a phone number for Square Inc.  Square changed its name to Block in 2021, however, the e-receipts issued in 2023 still name Square.  The e-receipts make no mention of Cash App or Block.  Although the e-receipt obtained from the VanillaDirect website instructs consumers to call Square for payment inquires, it then says, "Refunds may be given or denied in ***InComm Financial Services, Inc.'s*** sole discretion and to the extent permitted by law."  The e-receipt also provides a 1-800-number for InComm.  As of at least December 4, 2023, this phone number does not appear to be in service.  And Cash App cannot cancel or refund a completed Cash App deposit, directing consumers who sent money to the wrong account to ask the recipient for a refund (even if they don't know the recipient).[48]  Again, consumers are left with no recourse.

## E.     Plaintiff Was Fraudulently Induced to Transfer Money through Cash App at Walmart

100.    Plaintiff Risa Potters is a 73-year-old woman who lives alone in Agoura Hills, California.  She works part time as a yoga teacher and chiropractor.  In 2018, Plaintiff's home in Seminole Springs was destroyed in the Woolsey Fire.  She moved between several rental properties after the fire.

101.    On or about March 31, 2023, Plaintiff received a phone call from a number she did not recognize.  She allowed the call to go to voicemail.  A few minutes later, Plaintiff listened to the voicemail.  The caller identified himself as "Sergeant Jeff Thomas" from the Madera County Sheriff's Office (hereinafter, the "caller") and he asked for Plaintiff by name.  He stated that he had "very sensitive information" he needed to discuss with Plaintiff and asked that Plaintiff return his call right away.

---

[48] *I Sent Money to the Wrong Account!*, CASH APP SUPPORT, https://cash.app/help/us/en-us/6501-sent-money-to-the-wrong-account (last visited Dec. 6, 2023).

102.     Because the caller identified himself as a police officer and asked for her by name, Plaintiff returned the call.  His voice was authoritative and confident, which did not lead Plaintiff to question his identification as a police officer. "Sergeant Thomas" told Plaintiff that she had been subpoenaed to appear in court. He gave her the address where the subpoena was sent, which was one of the residences Plaintiff had rented after the fire.  The caller informed Plaintiff that she was subpoenaed in a case involving one of her chiropractic patients, and she was required to testify regarding her treatment of that patient.

103.     The caller stated that the subpoena had Plaintiff's signature on it, and the judge had expected her in court as required by the subpoena.  The caller further informed Plaintiff that, because she did not appear in court after receiving and signing the subpoena, the judge was very upset and issued a $10,000 bond against Plaintiff for failure to appear.  The caller informed Plaintiff of the name of the judge (Judge Kimberly J. Mueller, an active judge of the United States District Court for the Eastern District of California) and provided Plaintiff with a supposed case number (FTA A-CV-4998, COC-CV-1337, with the "FTA" supposedly standing for "Failure to Appear").

104.     Plaintiff informed the caller that she did not recall receiving or signing a subpoena.  The caller stated that if the subpoena was not signed by Plaintiff, it was signed by someone at her prior address using Plaintiff's name.

105.     The caller reiterated that failing to appear in court is a serious offense and that Plaintiff needed to post the $10,000 bond, which would be returned when the judge determined the signature on the subpoena did not belong to Plaintiff.  If Plaintiff did not want to post the bond, the police would need to arrest her and keep her in custody until the judge could review the matter.  The caller told Plaintiff they had her location and would need to arrest her immediately if she was not able to post the bond.  The caller further informed Plaintiff that, after posting the $10,000 bond, she would need to immediately go to the nearest police station and show them her

signature so that they could confirm she did not sign the subpoena.  After the first conversation, the caller phoned Plaintiff incessantly, checking in with her nearly every five minutes, directing her to leave her phone turned on so he could overhear her conversations, and asking for her odometer readings.  Terrified, Plaintiff obeyed the caller, whom she believed to be a law enforcement officer.

106.     What followed were forty-eight hours of harassment, monitoring, and threats.

107.     Plaintiff has never used any financial services at Walmart before, nor is she a regular customer.  Plaintiff has also never heard of or used Cash App prior to this incident.  It appeared that the caller knew exactly which Walmart stores would facilitate deposits into the "court's account" and the caller directed Plaintiff to those specific Walmart stores.  The caller explained to Plaintiff that he would text her barcodes, and she needed to show the barcode to the Walmart employee who would scan the barcode and accept the cash from Plaintiff.  The caller informed Plaintiff that the barcodes expire after ten minutes, so she would receive several in a row.

108.     It was almost 6:00 p.m. on March 31, 2023 when Plaintiff arrived at the Simi Valley Walmart store located at 2204 Tapo Street, Simi Valley, CA 93063. While Plaintiff was waiting in a long line at Walmart's Service Desk, the caller texted Plaintiff screenshots of Cash App barcodes, and instructed Plaintiff to show the barcodes to the Walmart employee when she reached the counter.

109.     An image of one of the barcodes the caller sent to Plaintiff is below:

110.     When Plaintiff reached the front of the line at the Walmart Service Desk counter, Plaintiff showed a Walmart employee a screenshot of a barcode and said she needed to send $10,000.00 to the barcode.

111.     The employee told Plaintiff there is a $1,500 limit per store per day, and a maximum $500 per transaction.  The Walmart employee told Plaintiff she could make multiple transactions for $500 each instead.

112.     Plaintiff then counted out $500 for the first transaction and gave the money to the Walmart employee.  The Walmart employee scanned a screenshot of the Cash App barcode that Plaintiff presented on her phone.  The employee told Plaintiff the barcodes expired after a short time and the first transaction was voided, because, on information and belief, the barcode had expired.

113.     Plaintiff waited in front of the Walmart store employee as she pulled up additional barcode screenshots the scammer was sending to her via text message—barcodes which should only be generated within the Cash App.  The Walmart store employee then scanned the screenshot of the new barcode, and the transaction went through.  The Walmart employee then processed two additional transactions for $500 each.

114.     The Walmart store employee did not at any time warn Plaintiff that receiving Cash App deposit barcodes from another person, as Plaintiff was doing in front of the Walmart store employee, was likely related to fraudulent activity.  Nor did the Walmart employee inform Plaintiff that Cash App deposits should only be made into Plaintiff's own Cash App account and not used to transfer funds to others.  Nor did the Walmart employee attempt to link any ID from Plaintiff to a Cash App account.  No suspicions were raised even though a 73-year-old woman who had never used Walmart financial services before attempted to put $10,000 onto a Cash App barcode belonging to an App she had never heard of—which the Walmart employee would have known if Walmart had an effective AML policy in place.  Nor did it raise any red flags that Plaintiff was digging through her text messages for unexpired Cash App barcodes rather than generating them through the App.

115.     Following the visit to the Simi Valley Walmart store location, the caller instructed Plaintiff to keep her phone turned on all night so that the "police" could make    sure    she    was    not    fleeing    before    posting    the    bond.    The "Sergeant" called Plaintiff's phone throughout the night and into the next morning. Plaintiff was disoriented and exhausted.  The caller assured Plaintiff that as soon as she posted the bail money, she would go to the police station, prove the signature was not hers, and the judge would return the bail money.

116.     The caller again phoned Plaintiff at 7:00 a.m. the next day, April 1, 2023, and less than twelve hours since Plaintiff left the Simi Valley Walmart store location.

117.     The caller instructed Plaintiff to go to the Walmart store location at 6433 Fallbrook Avenue, West Hills, CA 91307 to make further Cash App deposits to the supposed "bond account."  Plaintiff told caller that Walmart store location was far from her house, and the caller insisted she visit that location.  The caller requested the mileage reading from Plaintiff's odometer, assuring her that if she was found innocent the court would reimburse Plaintiff for the gas used to drive to Walmart.

1    Plaintiff arrived at the West Hills Walmart store location and waited in line while the

2    caller intermittently called and texted her.

3        118.        When Plaintiff reached the counter, Plaintiff told the Walmart employee

4    she needed to send money to a barcode.  Plaintiff handed money to the Walmart

5    employee and the Walmart employee scanned the screenshot of the Cash App

6    barcode on Plaintiff's phone.  The transaction was voided, on information and belief,

7    because the Cash App barcode had expired.  After attempting to process the $500

8    transaction, the Walmart employee told Plaintiff she had never seen the Cash App

9    barcodes before and was not sure how to use them.  The Walmart employee then

10   asked another Walmart employee to assist.  The next Walmart employee processed

11   five additional Cash App deposit transactions, one of which was voided, transferring

12   another $2,000.00 ($500 per transaction) in fraudulent payments to scammers.

13       119.        At no time did the Walmart employees link Plaintiff's ID to a Cash App

14   account or inform Plaintiff that Walmart and Cash App do not allow money transfers

15   via Cash App cash deposits.  Cash App did not flag any of the transactions Plaintiff

16   made on its end, nor did Cash App require Walmart to notify of it of suspicious

17   transactions—for example, an elderly customer depositing three-times the $1,000

18   weekly limit onto someone else's Cash App account over a period of less than 24

19   hours.

20       120.        A few hours later, the caller instructed Plaintiff to go to the Porter Ranch

21   Walmart store location at 19821 Rinaldi Street, Porter Ranch, CA 91326 and make

22   additional Cash App deposits.  Plaintiff was exhausted and scared, and the caller

23   insisted that Plaintiff make the transactions at the Porter Ranch Walmart store

24   location.

25       121.        At the Porter Ranch Walmart store location, the caller again texted

26   Plaintiff screenshots of Cash App barcodes, and a Walmart employee facilitated the

27   transfer of another $1,000 to the scammers via screenshots of Cash App barcodes.

28

122.     In 24 hours, three Walmart store locations facilitated Plaintiff transferring $4,000 through Cash App deposits.[49]  Neither Cash App nor Walmart flagged any of Plaintiff's activities as suspicious or likely to involve fraud.  At all three Walmart store locations, Walmart employees handling financial transactions failed to implement an AML; failed to link an ID to a Cash App account; failed to notify Plaintiff she could not transfer money to a Cash App barcode associated with someone else's Cash App account; failed to notify Plaintiff of, or to enforce, the stated deposit limits; failed to raise any suspicions when a 73-year-old woman who is not a regular customer attempted to transfer $10,000 in cash to a Cash App barcode; and failed to have a mechanism to link transactions between Walmart stores, such that an additional red flag should have been raised when Plaintiff visited three Walmart store locations in less than 24 hours to send cash in violation of provider restrictions.  Cash App similarly did not have a protocol in place to require a link between Cash App deposits and Cash App accounts, nor did its platform adhere to an AML to weed out accounts like those of the scammer(s) who received Plaintiff's money.  Additionally, when the transactions were instantly processed, Cash App has no method for providing recourse other than for victims to ask the recipient directly for a refund—but Plaintiff would not have any method of doing that.  The transaction receipts provided by Walmart to Plaintiff do not even mention Cash App, and Plaintiff did not even have a Cash App account from which to request a refund from recipients of the funds.

123.     When Plaintiff began to grow tired and weary following the caller's demands that she make further payments, the caller told Plaintiff it was time for her to go to the nearest police station and show that her signature did not match the signature on the supposed subpoena.  Plaintiff got in her car to drive to the Lost Hills Sheriff's Office.  While on the way to the police department, the caller began asking

---

[49] Plaintiff made two additional Cash App deposits at Rite Aid store locations. None of these transactions were flagged by Cash App.

Plaintiff indecent questions and made lewd statements to Plaintiff. It was at this point that Plaintiff realized the caller was likely not a police officer. Plaintiff was disgusted and immediately hung up the phone. Plaintiff was mortified and realized she was likely the victim of fraud.

124.    Plaintiff made a police report with the Los Angeles County Sheriff's Office on April 3, 2023, detailing what happened. On information and belief, the police have not located any suspect.

125.    In total, Plaintiff lost $4,000 in Cash App deposits facilitated by Walmart store employees at Walmart store locations. To date, Plaintiff has not been compensated for her loss.

126.    Plaintiff has suffered emotional and financial distress from her ordeal, and she is embarrassed that she was scammed.

## IV.  CLASS ALLEGATIONS

127.    Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

128.    The proposed Classes are defined as:

### The Walmart Classes[50]

### The Nationwide Walmart Class

All persons who incurred unreimbursed losses from January 1, 2021 to the present due to fraudulent money transfers initiated at and/or through a Walmart store location in the United States.

[50] The Nationwide Walmart Class and the California Walmart Subclass are hereinafter collectively referred to as the "Walmart Classes."

**The California Walmart Subclass**

All persons who incurred unreimbursed losses from January 1, 2021 to the present due to fraudulent money transfers initiated at and/or through a Walmart store location in California.

**The Cash App Classes**[51]

**The Nationwide Cash App Class**

All persons in the United States who incurred unreimbursed losses from January 1, 2021 to the present as a result of making paper money deposits into a Cash App account(s) other than their own Cash App account.

**The California Cash App Subclass**

All persons in California who incurred unreimbursed losses from January 1, 2021 to the present as a result of making paper money deposits into a Cash App account(s) other than their own Cash App account.

129.    The Nationwide Walmart Class, California Walmart Subclass, Nationwide Cash App Class, and California Cash App Subclass are hereinafter collectively referred to as the "Classes."

130.    Plaintiff reserves the right to modify and/or amend the definition(s) of the proposed Classes before the Court determines whether class certification is appropriate.

131.    Specifically excluded from the Classes are Defendants, their parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendants have a controlling interest, all class members who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

---

[51] The Nationwide Cash App Class and the California Cash App Subclass are hereinafter collectively referred to as the "Cash App Classes."

132.     The members of the Classes are so numerous that joinder is impractical. The Classes likely consist of thousands of members, the identity of whom is within the knowledge of and can be ascertained by resort to Defendants' records, the entities to whom Defendants direct fraud victims to report fraud, and/or self-identification.

133.     The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all members of the Classes, was injured through Defendants' uniform misconduct as alleged above.  Specifically, members of the Classes were harmed by Defendants' uniform failures to conduct their financial services so as to avoid harm to consumers like Plaintiff.  Defendants continues to allow under- or un-trained employees to handle financial transactions without employing adequate AML or other fraud-prevention policies.  As alleged herein, Plaintiff, like all members of the Classes, was deprived of monies that rightfully belonged to her.  Further, there are no defenses available to Defendants that are unique to Plaintiff.  Furthermore, the factual basis of Defendants' alleged misconduct is common to all members of the Classes and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.  Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other members of the Classes.

134.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual members of the Classes.

135.     The questions of law and fact common to the Classes include, but are not limited to:

        a.     Whether Defendants' representations and omissions about Walmart's and/or Cash App's money transfer services are false, misleading, deceptive, and/or likely to deceive;

        b.     Whether Defendants failed to disclose the risks of using the Services;

c.  Whether Plaintiff and the class members were damaged by Defendants' conduct;

d.  Whether Defendants' practices, actions, and/or inactions violated the consumer protection statutes invoked herein;

e.  Whether Defendants' practices, actions, and/or inactions violated California and/or federal law;

f.  Whether Defendants were negligent in failing to guard Plaintiff and other members of the proposed Classes against known risks;

g.  The proper method or methods by which to measure damages;

h.  Whether Defendants are legally required to cover transactions that Plaintiff and members of the Classes were fraudulently induced to enter into; and

i.  The declaratory, injunctive, and other equitable relief to which the Classes are entitled.

136.  Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against large corporations. Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

137.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Walmart and Cash App, no class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Classes will continue to suffer losses and Defendants' misconduct will proceed without remedy.

138.  Even if class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues

involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

139.    Plaintiff suffers a substantial risk of repeated injury in the future, particularly as Walmart expands its financial services offerings while still failing to address the inadequacies raised by the FTC and court orders over the last several years.  Plaintiff, like all members of the Classes, is at risk of being victimized by future fraudulent transactions that Defendants will likely readily facilitate.  Plaintiff and the members of the Classes are entitled to injunctive and declaratory relief as a result of the conduct complained of herein.  Money damages alone could not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendants from continuing to commit their unfair and/or illegal actions.

140.    Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

## V.  CAUSES OF ACTION

### COUNT ONE

**Breach of the Covenant of Good Faith and Fair Dealing**
**(Individually and on Behalf of the Walmart Classes against Walmart)**

141.    Plaintiff incorporates and re-alleges each of the foregoing paragraphs above as though fully set forth herein.

142.    Plaintiff brings this claim on behalf of herself and members of the Nationwide Walmart Class and the California Walmart Subclass against Defendant Walmart.

143.     As an agent for its providers, Walmart contracted with Plaintiff and members of the Walmart Classes for the provision of financial services.

144.     Under the law of each of the states where Defendants do business, an implied covenant of good faith and fair dealing governs every contract.  The covenant of good faith and fair dealing constrains Defendants' discretion to abuse self-granted contractual powers.

145.     This good faith requirement extends to the manner in which a party employs discretion conferred by a contract.

146.     Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

147.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Other examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

148.     Defendant Walmart breached the covenant of good faith and fair dealing when, as described herein, it failed to fairly investigate and/or prevent fraudulent Cash App deposit transactions at Walmart store locations and failed to reimburse customers for fraud-induced losses incurred using Cash App deposits at Walmart store locations.  In addition, Defendant Walmart breached the covenant of good faith and fair dealing by failing to adequately advise Plaintiff and members of the Walmart Classes regarding the risks of fraudulent transactions involving money transfers and by failing to adhere to and implement adequate fraud-prevention policies.

149.     Each of Defendant Walmart's actions were done in bad faith and were arbitrary and capricious.

150.     Plaintiff and members of the Walmart Classes have performed all of the obligations imposed under the contract.

151.     Plaintiff and members of the Walmart Classes have sustained monetary damages as a result of Defendant Walmart's breaches of the contract and the covenant of good faith and fair dealing.

<u>COUNT TWO</u>

**Violation of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750,** *et seq.*

**(Individually and on Behalf of the California Walmart Subclass and California Cash App Subclass against Walmart and Cash App)**

152.     Plaintiff incorporates and re-alleges each of the foregoing paragraphs above as though fully set forth herein.

153.     Plaintiff brings this claim on behalf of herself and members of the California Walmart Subclass and California Cash App Subclass against Defendants Walmart and Cash App pursuant to the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA").

154.     Walmart's and Cash App's actions, inactions, and/or conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale of goods or services to consumers in the State of California.

155.     Plaintiff and other members of the California Walmart Subclass and California Cash App Subclass are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

156.     The Cash App deposits that Plaintiff made at and through California Walmart store locations, as well as the Cash App deposits that similarly situated members of the California Walmart Subclass and California Cash App Subclass

made at Walmart store locations in California, are "services" within the meaning of California Civil Code § 1761(b).

157.     By engaging in the actions, inactions, and/or conduct set forth in this Complaint, as described above, Defendants Walmart and Cash App have violated, and continue to violate, California Civil Code § 1770(26), which prohibits "[a]dvertising, offering for sale, or selling a financial product that is illegal under state or federal law . . . ."

158.     Specifically, Walmart and Cash App's acts, practices, and/or omissions as alleged herein are illegal under, at a minimum, California Bus. & Prof. Code §§ 17200, *et seq.*

159.     Plaintiff requests that this Court enjoin Walmart and Cash App from continuing to employ the unlawful methods, acts, practices, and/or omissions alleged herein pursuant to California Civil Code §§ 1780(a)(2), 1782(d).  If Walmart and Cash App are not restrained from engaging in these types of practices in the future, Plaintiff and other members of the California Walmart Subclass and California Cash App Subclass will continue to suffer harm.

160.     Plaintiff also requests that this Court award her costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(e).

161.     In compliance with California Civil Code § 1780(d), an affidavit of venue is filed herewith.

### COUNT THREE

**Violation of California's Unfair Competition Law ("UCL"),**
**Bus. & Prof. Code §§ 17200, *et seq.***
**(Individually and on Behalf of the California Walmart Subclass and California Cash App Subclass against Walmart and Cash App)**

162.     Plaintiff incorporates and re-alleges each of the foregoing paragraphs above as though fully set forth herein.

163.     Plaintiff brings this claim individually and on behalf of the members of the California Walmart Subclass and California Cash App Subclass against Defendants Walmart and Cash App.

164.     The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice.  Cal. Bus. & Prof. Code § 17200.

165.     The UCL imposes strict liability.  Plaintiff need not prove that Defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

166.     Plaintiff is a "person" within the meaning of Bus. & Prof. Code § 17204. Plaintiff has suffered injury in fact and has lost money as a result of Defendants' violations of the UCL.  Plaintiff has standing to bring this action for injunctive and other relief appropriate under the UCL on behalf of herself and the putative California Walmart Subclass and California Cash App Subclass.

**A.     Defendants Engaged in Business Acts and/or Practices**

167.     At all relevant times, Defendants Walmart and Cash App engaged in the business act and/or practice of providing money transfer services, namely Cash App deposits at Walmart store locations in California.  Defendant Cash App engaged in the business act and/or practice of facilitating Cash App deposits through their platform and Defendant Walmart engaged in the business act and/or practice of facilitating Cash App deposits by accepting paper money to be deposited into Cash App accounts at its Walmart store locations throughout California.

**B.     Defendants' Business Acts and/or Practices Were Unlawful and Unfair**

168.     Defendants' business acts and/or practices were unlawful and/or unfair.[52]

---

[52] Plaintiff has alleged here and throughout this Complaint that Defendants' business acts and/or practices were unlawful and/or unfair.  These requirements are disjunctive, meaning a business act or practice need only rise to the level of *one* of these requirements to violate California Business & Professions Code § 17200.  *See*

## 1. Defendants' Business Acts and/or Practices Were Unlawful

169.     Defendants' business acts and/or practices were unlawful.

170.     As described throughout this Complaint and incorporated herein, Defendants breached the duty of good faith and fair dealing.  Defendants' bad-faith conduct violated the law.

171.     Additionally, Defendants' acts and/or omissions also violated other laws, including California's CLRA and common law negligence violations.

172.     The violation of any law (state or federal) constitutes an "unlawful" business practice under the UCL.

173.     As alleged herein, the acts and/or practices alleged were intended to or did result in violations of, at least, the CLRA and various states' common law.

## 2. Defendants' Business Acts and/or Practices Were Unfair

174.     Defendants' business acts and/or practices were unfair.

175.     A business act and/or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications, and motives of the practice against the gravity of the harm to the alleged victims.

176.     Defendants' actions as alleged herein constitute "unfair" business acts and/or practices because, as alleged above, Defendants' practices regarding the operation of Cash App deposits at Walmart store locations, including Defendants' inadequate (or even nonexistent) fraud prevention policies, offend an established public policy in the state of California of preventing fraud and protecting consumers from harm and Defendants' alleged acts and/or omissions are immoral, unethical, oppressive, and/or unscrupulous activities that are substantially injurious to consumers.

---

Cal. Bus. & Prof. Code § 17200 ("[U]nfair competition shall mean and include any unlawful, unfair *or* fraudulent business act or practice . . . ." (emphasis added)).

## COUNT FOUR

### Negligence
### (Individually and on Behalf of the Classes against Walmart and Cash App)

177.     Plaintiff incorporates and re-alleges each of the foregoing paragraphs above as though fully set forth herein.

178.     Plaintiff brings this claim on behalf of herself and members of the Classes.

179.     Defendants Walmart and Cash App owed duties to Plaintiff and members of the proposed Classes to use reasonable care to protect and secure customer funds that were entrusted to them and to ensure that fraudulent conduct was not taking place in and through their stores and on their platforms.

180.     As detailed above, Defendants had full knowledge of the types of harm that Plaintiff and the members of the proposed Classes could and would suffer if Defendants did not take sufficient measures to prevent fraud from occurring in and through their stores and platforms.

181.     Defendants breached their duties to Plaintiff and members of the Classes by failing to prevent the fraudulent use of their stores and/or platforms by criminals and by failing to warn Plaintiff and members of the Classes of the widespread use of Defendants' stores and platforms for fraudulent means.

182.     Defendants further breached their duties to Plaintiff and members of the Classes by failing to train their employees to prevent and stop fraudulent conduct from occurring in and through their stores and platforms.

183.     Defendants failed to use reasonable care in processing the fraudulent transactions described in this Complaint, despite their knowledge of widespread fraudulent use of their stores and platforms and the high likelihood that fraudulent conduct would continue to occur.

184.     But for Defendants' negligence, Plaintiff and members of the proposed Classes would not have suffered the damages alleged herein, namely the loss of monies via Cash App deposits at and/or through Walmart stores.

185.     As a direct and proximate result of Defendants' negligence, Plaintiff and members of the proposed Classes were damaged in an amount to be proven at trial.

*     *     *

186.     The harm to Plaintiff and class members outweighs the utility of Defendants' practices.   There were reasonably available alternatives to further Defendants' legitimate business interests, such as establishing and maintaining effective fraud prevention protocols and properly training employees to detect and prevent fraudulent activities.

187.     Defendants' violations of the UCL, through their unlawful and/or unfair business practices, are ongoing and present a continuing threat that class members and the public will be deceived into conducting further fraudulent Cash App deposits at Walmart store locations.   These transactions lead to financial damage for consumers like Plaintiff and members of the Classes.

188.     Under the UCL, Plaintiff is entitled to preliminary and permanent injunctive relief and an order that Defendants cease this unfair competition, as well as disgorgement and restitution to Plaintiff and members of the Classes of all Defendants' revenues associated with its unfair competition, or such portion of those revenues as the Court may find equitable.

## VI.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests this Court enter judgment against Defendants, as follows:

        a) For an order certifying this action as a class action, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

b) For compensatory, statutory, and punitive damages on all applicable claims and in an amount to be proven at trial;

c) For restitution on all applicable claims and in an amount to be proven at trial;

d) For an order requiring Defendants to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

e) For an order enjoining the wrongful conduct alleged herein;

f) For other appropriate injunctive and equitable relief;

g) For costs;

h) For pre-judgment and post-judgment interest as provided by law;

i) For attorneys' fees under any and all applicable rules and law; and

j) For such other relief as the Court deems just and proper.

## VII.  <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a trial by jury of any and all issues in this action so triable.

DATED: December 8, 2023

*/s/ Brian R. Strange*
Brian R. Strange, Esq. (State Bar #103252)
brian@strangellp.com
John Ceglia, Esq. (State Bar #287147)
john@strangellp.com
Brianna Strange, Esq. (State Bar # 321882)
brianna@strangellp.com
**STRANGE LLP**
12100 Wilshire Blvd., Ste. 420
Los Angeles, CA 90025
Telephone: (310) 207-5055

*Attorneys for Plaintiff*